# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

BAYER AG,
MONSANTO COMPANY, and
BASF SE,

*Defendants.*

No. 18-1241

## ~~PROPOSED~~ FINAL JUDGMENT

WHEREAS, Plaintiff United States of America filed its Complaint against Bayer AG ("Bayer") and Monsanto Company ("Monsanto") on May 29, 2018;

AND WHEREAS, pursuant to a Stipulation and Order among Bayer, Monsanto, and BASF SE ("BASF") (collectively, "Defendants") and Plaintiff, the Court has joined BASF as a defendant to this action for the purposes of settlement and for the entry of this Final Judgment;

AND WHEREAS, Plaintiff and Defendants, by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by this Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain businesses, rights, and assets by Bayer and Monsanto to assure that competition is not substantially lessened;

AND WHEREAS, Plaintiff requires Bayer and Monsanto to make certain divestitures to BASF for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Bayer and Monsanto have represented to Plaintiff that all of the divestitures required below can and will be made as required by this Final Judgment, BASF has represented to Plaintiff that it can and will acquire the Divestiture Assets pursuant to its obligations under this Final Judgment, and Defendants have represented to Plaintiff that they will later raise no claim of hardship or difficulty as grounds for failing to comply with their obligations under this Final Judgment or for asking this Court to modify any of the provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED, AND DECREED:

## I.      JURISDICTION

This Court has jurisdiction over the subject matter of and each of the parties hereto with respect to this action.  The Complaint states a claim upon which relief may be granted against Bayer and Monsanto under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).  Pursuant to the Stipulation and Order filed simultaneously with this Final Judgment joining BASF as a defendant to this action, BASF has consented to this Court's exercise of specific personal jurisdiction over BASF in this matter solely for the purposes of settlement and for the entry and enforcement of the Final Judgment.

## II.     DEFINITIONS

As used in this Final Judgment:

A.      "Bayer" means Defendant Bayer AG, a German corporation with its headquarters in Leverkusen, Germany, its successors and assigns, and its subsidiaries, divisions, groups,

affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

B.    "Monsanto" means Defendant Monsanto Company, a Delaware corporation with its headquarters in St. Louis, Missouri, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

C.    "BASF" means Defendant BASF SE, a Societas Europaea with its headquarters in Ludwigshafen, Germany, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

D.    "'839 Business" means Bayer's global business of researching, developing, and manufacturing the BCS-CT12839 pipeline product.

E.    "Balance Herbicide Business" means Bayer's global business of researching, developing, manufacturing, and selling isoxaflutole-based herbicides for use on crops that are isoxaflutole-tolerant as a result of genetic modification.

F.    "Balance Herbicide Divestiture Assets" means the following assets related to the Balance Herbicide Business:

(1)    all tangible assets used primarily by or critical to the operation of the Balance Herbicide Business, including, but not limited to, all transferable licenses, permits, product registrations, regulatory submissions, and authorizations issued by or submitted to any governmental organization; all contracts, agreements, leases, commitments, certifications, and understandings, including supply agreements; and all customer lists, accounts, credit records, and transferable customer contracts;

(2)     all patents used by the Balance Herbicide Business;

(3)     a worldwide, exclusive, royalty-free, paid-up, irrevocable, perpetual license to Bayer's BALANCE trademark for marketing and selling isoxaflutole-based herbicides for use on crops that are isoxaflutole-tolerant as a result of genetic modification;

(4)     a worldwide, non-exclusive, royalty-free, paid-up, irrevocable, perpetual license (sub-licensable to any tollers designated by BASF) to any intellectual property, registration data, technology, know-how, or other rights used in the manufacture or formulation of isoxaflutole-based herbicides for use on crops that are isoxaflutole-tolerant as a result of genetic modification; and

(5)     all other intangible assets owned, licensed, controlled, or used primarily by or critical to the operation of the Balance Herbicide Business, including, but not limited to, all data concerning historical and current research and development efforts, including, but not limited to, designs of experiments and the results of successful and unsuccessful designs and experiments.

G.     "Broad Acre Seeds and Traits Business" means Bayer's global business of researching, developing, manufacturing, and selling broad acre seeds and traits, including, but not limited to, the global cotton seed business; the global canola seed business; the global soybean seed business; the global LibertyLink trait business for all crops except rice; the global research and development programs for wheat and "canola quality" *Brassica juncea*; and the global trait research and development activities.  The Broad Acre Seeds and Traits Business excludes those assets that relate solely to the following:  hybrid rice sold in Asia, hybrid cotton sold in India, traditional *juncea* (mustard) and millet sold in India, cotton sold in South Africa,

the research and development program for sugarcane in Brazil, the research and development program for sugarbeets in Europe, and the LibertyLink event in rice.

H.      "Broad Acre Seeds and Traits Divestiture Assets" means the following assets related to the Broad Acre Seeds and Traits Business:

(1)      all tangible assets that comprise the Broad Acre Seeds and Traits Business, including, but not limited to, research and development activities; all manufacturing plants and equipment, tooling and fixed assets, personal property, inventory, office furniture, materials, supplies, and other tangible property; all transferable licenses, permits, product registrations and regulatory submissions (including supporting data), certifications, and authorizations issued by or submitted to any governmental organization; all contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings, including supply agreements; all customer lists, accounts, credit records, and transferable customer contracts; all other business and administrative records; all seed production facilities; all breeding stations; all research and development facilities; all germplasm; and all breeding data, including, but not limited to, phenotype, genotype, molecular markers, and performance data;

(2)      all intangible assets owned, licensed, controlled, or used by the Broad Acre Seeds and Traits Business, including, but not limited to, all patents, plant variety certificates, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, manuals and technical information provided by Bayer to its own

employees, customers, suppliers, agents, or licensees; and research data concerning historical and current research and development efforts, including, but not limited to, designs of experiments and the results of successful and unsuccessful designs and experiments; and

(3)     the copy of Bayer's microbial strain collection ("MSC") stored in Morrisville, North Carolina, including, but not limited to, all biological materials comprising the MSC and all documents, data, information, reference materials, and trade secrets related to the MSC, and (a) a worldwide, exclusive, royalty-free, paid-up, irrevocable, perpetual license to use the MSC for trait research in any crop and (b) a worldwide, non-exclusive, royalty-free, paid-up, irrevocable, perpetual license to use the MSC for any other agricultural use.

Notwithstanding Paragraphs II(H)(1) through II(H)(3) above, the Broad Acre Seeds and Traits Divestiture Assets do not include the facilities identified in Appendix A, Paragraphs 1 and 2, or trademarks, trade names, service marks, or service names containing the name "Bayer."

I.     "Clothianidin Seed Treatment Business" means Bayer's global business of researching, developing, manufacturing, and selling seed treatments containing clothianidin, *Bacillus firmus* strain I-1582, or *Bacillus thuringiensis* strain EX 297512.  The Clothianidin Seed Treatment Business excludes Bayer's business of manufacturing and selling seed treatment mixture products containing clothianidin for canola/oilseed rape, potatoes, sugarbeets, cereals, or vegetables that have been commercialized by Bayer as of the date of filing of the Complaint in this matter (except Poncho/VOTiVO, Poncho Plus, and Poncho Super).  For the avoidance of doubt, these exclusions do not prevent BASF from researching, developing, manufacturing, and selling seed treatments containing clothianidin for canola/oilseed rape, potatoes, sugarbeets, cereals, or vegetables.

J.      "Collaboration" means an agreement among non-affiliated firms involving some sharing of resources, management, or risk, including, but not limited to, joint ventures or research alliances.  For the avoidance of doubt, Collaboration for the purpose of this Final Judgment does not include (1) stand-alone intellectual property licenses, including patent, trademark, software, know-how, variety, germplasm, and registration data license agreements; (2) stand-alone crop protection supply or tolling agreements; (3) cooperation agreements related to advocacy and public policy issues; (4) agreements related to participation in industry groups and organizations; and (5) material transfer agreements.

K.      "Digital Agriculture Business" means Bayer's global business of researching, developing, manufacturing, and selling digital agriculture products.

L.      "Digital Agriculture Divestiture Assets" means the following assets related to the Digital Agriculture Business:

(1)      all tangible assets that comprise the Digital Agriculture Business, including, but not limited to, research and development activities; all manufacturing plants and equipment, tooling and fixed assets, personal property, inventory, office furniture, materials, supplies, and other tangible property; all contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings, including supply agreements; all customer lists, accounts, credit records, and transferable customer contracts; all other business and administrative records; all research and development facilities; and

(2)      all intangible assets owned, licensed, controlled, or used by the Digital Agriculture Business, including, but not limited to, all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets,

drawings, blueprints, designs, design protocols, specifications for materials, specifications for

parts and devices, safety procedures for the handling of materials and substances, quality

assurance and control procedures, design tools and simulation capability, manuals and technical

information provided by Bayer to its own employees, customers, suppliers, agents, or licensees;

and research data concerning historical and current research and development efforts related to

the Digital Agriculture Business, including, but not limited to, designs of experiments and the

results of successful and unsuccessful designs and experiments.

Notwithstanding Paragraphs II(L)(1) and II(L)(2) above, the Digital Agriculture

Divestiture Assets do not include trademarks, trade names, service marks, or service names

containing the name "Bayer."

    M.    "Divestiture Assets" means:

        (1)    the Balance Herbicide Divestiture Assets;

        (2)    the Broad Acre Seeds and Traits Divestiture Assets;

        (3)    the Digital Agriculture Divestiture Assets;

        (4)    the Glufosinate Ammonium Divestiture Assets;

        (5)    the Midwest Soybean Germplasm Divestiture Assets;

        (6)    the Pipeline Herbicide Divestiture Assets;

        (7)    the Seed Treatment Divestiture Assets; and

        (8)    the Vegetable Seed Divestiture Assets.

    N.    "Divestiture Businesses" means the Balance Herbicide Business, the Broad Acre

Seeds and Traits Business, the Digital Agriculture Business, the Glufosinate Ammonium

Business, the Pipeline Herbicide Business, the Seed Treatment Business, and the Vegetable Seed

Business.

O.      "Divestiture Closing Date" means (1) with respect to assets, employees, and agreements related to all Divestiture Assets except the Vegetable Seed Divestiture Assets, the date on which Bayer divests those Divestiture Assets to BASF, and (2) with respect to assets, employees, and agreements related to the Vegetable Seed Divestiture Assets, the date on which Bayer divests the Vegetable Seed Divestiture Assets to BASF.

P.      "Fluopyram Seed Treatment Business" means Bayer's global business of researching, developing, manufacturing, and selling seed treatments containing fluopyram.  The Fluopyram Seed Treatment Business excludes Bayer's business of researching, developing, manufacturing, and selling cereals seed treatments containing fluopyram, claiming only fungicidal properties, and claiming no nematode control effect.  For the avoidance of doubt, this exclusion does not prevent BASF from researching, developing, manufacturing, and selling seed treatments for cereals containing fluopyram.

Q.      "Glufosinate Ammonium Business" means Bayer's global business of researching, developing, manufacturing, and selling glufosinate ammonium herbicide products.

R.      "Glufosinate Ammonium Divestiture Assets" means the following assets related to the Glufosinate Ammonium Business:

(1)     Bayer's glufosinate ammonium manufacturing facilities located in Hurth/Knapsack, Germany; Muskegon, Michigan; Mobile, Alabama; and Frankfurt, Germany; Bayer's glufosinate formulation facilities located in Regina, Canada and Muskegon, Michigan; and these facilities' associated manufacturing equipment, tooling and fixed assets, personal property, inventory, office furniture, materials, supplies, and other tangible property;

(2)     all other tangible assets used primarily by or critical to the operation of the Glufosinate Ammonium Business, including all contracts, teaming arrangements, agreements,

9

leases, commitments, certifications, and understandings, including supply agreements; all transferable licenses, permits, and authorizations issued by or submitted to any governmental organization; all customer lists, accounts, credit records, and transferable customer contracts; and all other business and administrative records;

(3)     all patents used in the Glufosinate Ammonium Business, except for (a) patents related to the mixture or combined or sequential use of glufosinate ammonium with other active ingredients ("Glufosinate Mixture and Use Patents") and (b) patents related to the use of glufosinate ammonium, alone or in mixtures, on plants containing genetically modified events developed or to be developed by Bayer or Monsanto ("Glufosinate Over-The-Top Patents");

(4)     a worldwide, exclusive, royalty-free, paid-up, irrevocable, perpetual license for all Glufosinate Mixture and Use Patents owned, controlled, licensed, or used by Bayer or Monsanto with one or more claims covering a BASF proprietary active ingredient;

(5)     a worldwide, non-exclusive, irrevocable, perpetual covenant not to assert against BASF or its direct or indirect customers all other Glufosinate Mixture and Use Patents owned, controlled, licensed, or used by Bayer or Monsanto with one or more claims covering any other active ingredient, except for any active ingredient itself covered by a Bayer or Monsanto patent, during the life of that patent;

(6)     a worldwide, non-exclusive, irrevocable, perpetual covenant not to assert against BASF or its direct or indirect customers all current or future Glufosinate Over-The-Top Patents owned, controlled, licensed, or used by Bayer or Monsanto;

(7)     all other intangible assets owned, licensed, controlled, or used primarily by or critical to the operation of the Glufosinate Ammonium Business, including, but not limited

to, all licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, manuals and technical information provided by Bayer to its own employees, customers, suppliers, agents, or licensees; and research data concerning historical and current research and development efforts, including, but not limited to, designs of experiments and the results of successful and unsuccessful designs and experiments; and

(8)      a worldwide, non-exclusive, royalty-free, paid-up, irrevocable, perpetual license to all other intellectual property (owned by Bayer or that Bayer has the right to license) that is used by the Glufosinate Ammonium Business and not addressed earlier in Paragraph II.R, including, but not limited to, all copyrights, trademarks, trade names, service marks, service names, and trade secrets.  Such license shall grant BASF the right to make, have made, use, sell or offer for sale, copy, create derivative works of, modify, improve, display, perform, and enhance the licensed intangible assets.  Any improvements or modifications to these intangible assets developed by BASF shall be owned solely by BASF.

Notwithstanding Paragraphs II(R)(1) through II(R)(8) above, the Glufosinate Ammonium Divestiture Assets do not include the thirty (30) general office facilities identified in Appendix A, Paragraph 1; the fourteen (14) formulation and filling sites identified in Appendix A, Paragraph 3; or trademarks, trade names, service marks, or service names containing the name "Bayer."

S.     "Midwest Soybean Germplasm Divestiture Assets" means the following

Monsanto assets:

(1)     the four hundred and nineteen (419) soybean populations identified in

Appendix B;

(2)     a worldwide, non-exclusive, royalty-free, paid-up, irrevocable, perpetual

license for breeding purposes (subject to the limitations in Paragraph II(S)(4)) to twenty (20)

soybean varieties developed by Monsanto that BASF subsequently will choose pursuant to the

following process: Bayer will expeditiously provide BASF with access (including to all

supporting data) to all of the Monsanto Corn States lines (for which Monsanto has the ability to

offer breeding rights) developed by Monsanto for each of the years 2019 and 2020. BASF may

choose two varieties for each of maturity zones zero through four, resulting in a license for

twenty (20) lines over the two (2) years;

(3)     all data (including, but not limited to, phenotype, genotype, molecular

markers, and performance data) related to the transferred populations or licensed breeding

varieties in Paragraph II(S)(1) above for the purpose of developing commercial soybean

varieties; and a copy of all data (including, but not limited to, phenotype, genotype, molecular

markers, and performance data) related to the transferred populations or licensed breeding

varieties in Paragraph II(S)(2) above for the purpose of developing commercial soybean

varieties; and

(4)     all rights to develop commercial soybean varieties using the transferred

populations or licensed breeding varieties in Paragraphs II(S)(1) and II(S)(2) above, which rights

shall not be limited other than requiring compliance with trait license agreements for any

Monsanto traits remaining in any developed line.

T.    "Pipeline Herbicide Business" means Bayer's global business of researching, developing, and manufacturing ketoenole and N,O-Chelator ("NOC") herbicides for non-selective uses.

U.    "Pipeline Herbicide Divestiture Assets" means the following assets related to the Pipeline Herbicide Business:

(1)    a worldwide, exclusive, royalty-free, paid-up, irrevocable, perpetual license in the field of non-selective uses for all Bayer intellectual property rights and know-how related to Bayer's ketoenole and to Bayer's NOC herbicide candidates;

(2)    a worldwide, non-exclusive, royalty-free, paid-up, irrevocable, perpetual license (sub-licensable to any tollers designated by BASF) to any intellectual property, registration data, technology, know-how, or other rights used in the manufacture or formulation of ketoenole and of NOC herbicides for non-selective uses;

(3)    all data, documents, and know-how from in vitro assays related to the use of Bayer's ketoenole and Bayer's NOC herbicide candidates with Bayer's relevant herbicide-tolerance traits;

(4)    all field trials conducted on Bayer's ketoenole and Bayer's NOC herbicide candidates for non-selective uses;

(5)    samples of all ketoenole and all NOC herbicide molecules; and

(6)    all data and information on the molecular structure and other characteristics of Bayer's ketoenole and Bayer's NOC herbicide candidates.

V.    "Relevant Personnel" means all Bayer employees who have supported or whose job related to the Divestiture Businesses at any time between January 1, 2015 and the Divestiture Closing Date.

13

W.   "Seed Treatment Business" means the Clothianidin Seed Treatment Business, the Fluopyram Seed Treatment Business, and the '839 Business.

X.   "Seed Treatment Divestiture Assets" means the following assets related to the Seed Treatment Business:

(1)   Bayer's Seed Growth Center located in Research Triangle Park, North Carolina, including all equipment, tooling and fixed assets, personal property, inventory, office furniture, materials, supplies, and other tangible property at this facility;

(2)   all other tangible assets used primarily by or critical to the operation of the Seed Treatment Business, including, but not limited to, all transferable licenses, permits, certifications, product registrations, regulatory submissions, and authorizations issued by or submitted to any governmental organization; all contracts, teaming arrangements, agreements, commitments, certifications, and understandings, including supply agreements; all customer lists, accounts, credit records, and transferable customer contracts; all sales and marketing assets, including, but not limited to, distribution plans and any market research conducted; all other business and administrative records; samples of all molecules; all information on the molecular structure and other characteristics of the products; and all internal and available external studies;

(3)   all patents used in Bayer's current and pipeline Poncho, Poncho Plus, Poncho Super, Poncho/VOTiVO, Poncho/VOTiVO 2.0, VOTiVO, VOTiVO 2.0, and TWO.0 seed treatments;

(4)   a worldwide, exclusive, royalty-free, paid-up, irrevocable, perpetual license to any other patent with one or more claims covering the combination of clothianidin, *Bacillus firmus* strain I-1582, or *Bacillus thuringiensis* strain EX 297512 with another active ingredient, for BASF to combine clothianidin, *Bacillus firmus* strain I-1582, or *Bacillus*

*thuringiensis* strain EX 297512 with any such other active ingredient(s) for seed treatment uses; provided, however, that this license does not include any right to make, sell, use, or otherwise commercialize any active ingredient itself covered by a Bayer or Monsanto patent, during the life of that patent;

(5)     a worldwide, exclusive, royalty-free, paid-up, irrevocable, perpetual license for seed treatment uses to all patents used in Bayer's current and pipeline ILeVO and COPeO seed treatments; provided, however, that this license will be non-exclusive for cereals seed treatments containing fluopyram, claiming only fungicidal properties, and claiming no nematode control effect;

(6)     a worldwide, exclusive, royalty-free, paid-up, irrevocable, perpetual license to any other patent with one or more claims covering the combination of fluopyram with another active ingredient, for BASF to combine fluopyram with any such other active ingredient(s) for seed treatment uses; provided, however, that (a) this license will be non-exclusive for cereals seed treatments containing fluopyram, claiming only fungicidal properties, and claiming no nematode control effect; and (b) this license does not include any right to make, sell, use, or otherwise commercialize any active ingredient itself covered by a Bayer or Monsanto patent, during the life of that patent;

(7)     all patents used exclusively in the '839 Business, and a worldwide, exclusive, royalty-free, paid-up, irrevocable, perpetual license to all other patents with one or more claims used in the '839 Business;

(8)     a worldwide, non-exclusive, irrevocable, perpetual covenant not to assert against BASF and its direct or indirect customers all other patents owned, controlled, licensed, or used by Bayer or Monsanto with claims covering the mixture or combined or sequential use of

clothianidin, *Bacillus firmus* strain I-1582, *Bacillus thuringiensis* strain EX 297512, fluopyram, or BCS-CT12839 with any active ingredient or combination of active ingredients, except for any active ingredient itself covered by a Bayer or Monsanto patent, during the life of that patent;

        (9)    a worldwide, non-exclusive, royalty-free, paid-up, irrevocable, perpetual license (sub-licensable to any tollers designated by BASF) to any other intellectual property, registration data, technology, know-how, or other rights used in the manufacture or formulation of any current or pipeline product divested as part of the Seed Treatment Business; and

        (10)    all other intangible assets owned, licensed, controlled, or used by the Seed Treatment Business, including, but not limited to, all licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, know-how, trade secrets, drawings, designs, design protocols, specifications for materials, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, manuals and technical information provided by Bayer to its own employees, customers, suppliers, agents, or licensees, and data concerning historical and current research and development efforts, including, but not limited to, designs of experiments and the results of successful and unsuccessful designs and experiments.

Notwithstanding Paragraphs II(X)(1) through II(X)(10) above, the Seed Treatment Divestiture Assets do not include (a) active ingredient production facilities in Dormagen, Germany; Bergkamen, Germany; or Tlaxcala, Mexico; (b) formulation, filling, or packaging sites in Amatitlan, Guatemala; Belford Roxo, Brazil; Frankfurt, Germany; Kansas City, Missouri; Pinkenba, Australia; or Zarate, Argentina; or (c) trademarks, trade names, service marks, or service names containing the name "Bayer."

Y.     "Shared Confidential Information" means confidential business information

relayed from Bayer to BASF, or vice versa, as a result of any agreements entered into pursuant to

Paragraph IV(G) or Paragraph IV(H) of this Final Judgment, including quantities, units, and

prices of items ordered or purchased, and any other competitively sensitive information

regarding Bayer's or BASF's performance under these agreements.

Z.     "Vegetable Seed Business" means Bayer's global business of researching,

developing, manufacturing, and selling vegetable seeds.

AA.    "Vegetable Seed Divestiture Assets" means the following assets related to the

Vegetable Seed Business:

(1)     all tangible assets that comprise the Vegetable Seed Business including,

but not limited to, research and development activities; all manufacturing plants and equipment,

tooling and fixed assets, personal property, inventory, office furniture, materials, supplies, and

other tangible property; all transferable licenses, permits, product registrations and regulatory

submissions (including supporting data), certifications, and authorizations issued by or submitted

to any governmental organization; all contracts, teaming arrangements, agreements, leases,

commitments, certifications, and understandings, including supply agreements; all customer lists,

accounts, credit records, and transferable customer contracts; all other business and

administrative records; seed production facilities; breeding stations; all research and

development facilities; all germplasm; and all breeding data, including, but not limited to,

phenotype, genotype, molecular markers, and performance data; and

(2)     all intangible assets owned, licensed, controlled, or used by the Vegetable

Seed Business, including, but not limited to, all patents, plant variety certificates, licenses and

sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service

names, technical information, computer software and related documentation, know-how, trade

secrets, drawings, blueprints, designs, design protocols, specifications for materials,

specifications for parts and devices, safety procedures for the handling of materials and

substances, quality assurance and control procedures, design tools and simulation capability,

manuals and technical information provided by Bayer to its own employees, customers,

suppliers, agents, or licensees; and research data concerning historical and current research and

development efforts, including, but not limited to, designs of experiments and the results of

successful and unsuccessful designs and experiments.

Notwithstanding Paragraphs II(AA)(1) and II(AA)(2) above, the Vegetable Seed

Divestiture Assets do not include the thirty-four (34) office facilities identified in Appendix A,

Paragraph 4, or trademarks, trade names, service marks, or service names containing the name

"Bayer."

BB.    "Yield and Stress Collaboration" means any agreement between Monsanto and

BASF existing as of the date of filing of the Complaint in this matter related to a collaboration to

develop yield and stress traits for row crops.

### III.    APPLICABILITY

This Final Judgment applies to Defendants and all other persons in active concert or

participation with any of them who receive actual notice of this Final Judgment by personal

service or otherwise.

### IV.    DIVESTITURES

A.    By the later of ninety (90) calendar days after the filing of the Complaint in this

matter or ninety (90) calendar days after receiving all international antitrust approvals required

for the transfer of the Divestiture Assets, Bayer and Monsanto are ordered and directed to divest

the Divestiture Assets to BASF in a manner consistent with this Final Judgment.  The United

States, in its sole discretion, may agree to one or more extensions of this period not to exceed

sixty (60) calendar days in total and shall notify this Court in such circumstances. Defendants

agree to use their best efforts to divest the Divestiture Assets as expeditiously as possible.

B.     Bayer shall permit BASF to have reasonable access to personnel and to make

inspections of the facilities to be acquired by BASF; access to any and all environmental, zoning,

and other permit documents and information; and access to any and all financial, operational, or

other documents and information customarily provided as part of a due diligence process.

C.     Bayer and Monsanto shall not take any action that will impede in any way the

permitting, operation, or divestiture of the Divestiture Assets.

D.     Unless the United States otherwise consents in writing, the divestitures pursuant

to Section IV of this Final Judgment shall include the entire Divestiture Assets and shall be

accomplished in such a way as to satisfy the United States, in its sole discretion, that the

Divestiture Assets can and will be used by BASF as part of the viable, ongoing operation of the

Divestiture Businesses. The divestitures shall be accomplished so as to satisfy the United States,

in its sole discretion, that none of the terms of any agreement between BASF and Bayer and

Monsanto give Bayer and Monsanto the ability unreasonably to raise BASF's costs, to lower

BASF's efficiency, or otherwise to interfere in the ability of BASF to compete effectively.

E.     **Employees**

(1)     Within ten (10) business days following the filing of the Complaint in this

matter, Bayer shall provide to BASF, the United States, and the Monitoring Trustee, organization

charts covering every person providing any support for the Divestiture Businesses for each year

since January 1, 2015. Within ten (10) business days of receiving a request from BASF, Bayer

shall provide to BASF, the United States, and the Monitoring Trustee, additional information

related to identified Relevant Personnel, including name, job title, reporting relationships, Hay points, past experience, responsibilities from January 1, 2015 through the Divestiture Closing Date, training and educational history, relevant certifications, job performance evaluations, and current salary and benefits information to enable BASF to make offers of employment. If Bayer is barred by any applicable laws from providing any of this information to BASF, within ten (10) business days of receiving BASF's request, Bayer shall provide the requested information to the greatest extent possible under applicable laws and also provide a written explanation of its inability to comply fully with BASF's request for information regarding Relevant Personnel.

(2)     Upon request, Bayer shall make Relevant Personnel available for interviews with BASF during normal business hours at a mutually agreeable location. Bayer will not interfere with any negotiations by BASF to employ any Relevant Personnel. Interference includes but is not limited to offering to increase the salary or benefits of Relevant Personnel other than as part of a company-wide increase in salary or benefits granted in the ordinary course of business.

(3)     For any Relevant Personnel who elect employment with BASF, Bayer shall waive all non-compete and non-disclosure agreements (except as noted in Paragraph IV(E)(5)), vest all unvested pension and other equity rights, and provide all benefits which Relevant Personnel would be provided if transferred to a buyer of an ongoing business.

(4)     For a period of two (2) years from the date of filing of the Complaint in this matter, Bayer may not solicit to hire, or hire, any such person who was hired by BASF, unless (a) such individual is terminated or laid off by BASF or (b) BASF agrees in writing that Bayer may solicit or hire that individual.

(5)     Nothing in Paragraph IV(E) shall prohibit Bayer from maintaining any reasonable restrictions on the disclosure by any employee who accepts an offer of employment with BASF of Bayer's proprietary non-public information that is (a) not otherwise required to be disclosed by this Final Judgment, (b) related solely to Bayer's businesses and clients, and (c) unrelated to the Divestiture Assets.

(6)     BASF's right to hire Relevant Personnel pursuant to Section IV(E) and Bayer's obligations under Paragraph IV(E)(1), Paragraph IV(E)(2), and Paragraph IV(E)(3) shall last for a period of one (1) year after the Divestiture Closing Date.

F.     **Asset Warranties**

(1)     In addition to any other warranties in the divestiture-related agreements entered into by Defendants, Bayer and Monsanto shall warrant to BASF (a) that each asset will be operational as of the Divestiture Closing Date; (b) that, for each of the Divestiture Assets, there are no material defects in the environmental, zoning, or other permits pertaining to the operation of each asset; (c) that following the sale of each of the Divestiture Assets, Bayer will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits related to the operation of each of the Divestiture Assets; and (d) the Divestiture Assets are sufficient in all material respects for BASF, taking into account BASF's assets and business, to maintain the viability and competitiveness of the Divestiture Businesses.

(2)     In addition to any other remedial provisions in the divestiture-related agreements entered into by Defendants, for a period of up to one (1) year following the Divestiture Closing Date, if BASF determines that any assets not included in the Divestiture Assets were previously used by the Divestiture Businesses and are reasonably necessary for the continued competitiveness of the Divestiture Businesses, it shall notify the United States, the

Monitoring Trustee, and Bayer in writing that it requires such assets. The United States, in its

sole discretion, taking into account BASF's assets and business, shall determine whether any of

the assets identified should be divested to BASF. If the United States determines that such assets

should be divested, Bayer and BASF will negotiate an agreement within thirty (30) calendar days

providing for the divestiture of such assets in a period to be determined by the United States in

consultation with Bayer and BASF. The terms of any such divestiture agreement shall be

commercially reasonable and must be acceptable to the United States, in its sole discretion.

> G.      **Supply and Tolling Agreements**

>> (1)      _Seed Treatment Supply Agreements for Broad Acre Seeds and Traits_

_Business:_  At the option of BASF, on or before the Divestiture Closing Date, Bayer shall enter

into one or more agreements with BASF for the supply of the Bayer seed treatments (except the

seed treatments divested as part of the Clothianidin Seed Treatment Business or Fluopyram Seed

Treatment Business) used by Bayer in the Broad Acre Seeds and Traits Business for an initial

period of up to two (2) years. Bayer will supply BASF with these seed treatments at variable

cost, in priority over other purchasers, and in the quantities demanded by BASF under any such

agreement until the expiration of that agreement. All other terms and conditions of any such

agreement must be reasonably related to market conditions for the supply of seed treatments.

Upon BASF's request, the United States, in its sole discretion, may approve one or more

extensions of any such agreement for a total of up to an additional two (2) years. The United

States, in its sole discretion, shall determine whether supply pursuant to any such extension must

be at variable cost.

> (2)      _Isoxaflutole Supply Agreement:_  At the option of BASF, on or before the

Divestiture Closing Date, Bayer shall enter into one or more agreements with BASF for the

supply of isoxaflutole to be used on crops that are isoxaflutole-tolerant as a result of genetic

modification for an initial period of two (2) years.  Bayer will supply BASF with formulated

isoxaflutole and the isoxaflutole active ingredient at variable cost, in priority over other

purchasers, and in the quantities demanded by BASF under any such agreement until the

expiration of that agreement.  All other terms and conditions of any such agreement must be

reasonably related to market conditions for the supply of herbicides and the active ingredients in

herbicides.  Upon BASF's request, the United States, in its sole discretion, may approve one or

more extensions of any such agreement for a total of up to an additional four (4) years.  The

United States, in its sole discretion, shall determine whether supply pursuant to any such

extension must be at variable cost.

       (3)     *Tolling Agreement for Glufosinate Ammonium:*  At the option of BASF,

on or before the Divestiture Closing Date, Bayer shall enter into one or more tolling agreements

with BASF for the formulation, filling, and packaging of glufosinate ammonium products for an

initial period of up to two (2) years.  Bayer will formulate, fill, and package glufosinate

ammonium products for BASF at variable cost, in priority over other purchasers, and in the

quantities demanded by BASF under any such agreement until the expiration of that agreement.

All other terms and conditions of any such agreement must be reasonably related to market

conditions for the formulation, filling, and packaging of herbicides.  Upon BASF's request, the

United States, in its sole discretion, may approve one or more extensions of any such agreement

for a total of up to an additional one (1) year.  The United States, in its sole discretion, shall

determine whether tolling pursuant to any such extension must be at variable cost.

       (4)     *Tolling Agreement for Divested Seed Treatment Formulations:*  At the

option of BASF, on or before the Divestiture Closing Date, Bayer shall enter into one or more

tolling agreements with BASF for the formulation, filling, and packaging of the seed treatments divested as part of the Clothianidin Seed Treatment Business and the Fluopyram Seed Treatment Business for an initial period of up to two (2) years. Bayer will toll these products for BASF at variable cost, in priority over other purchasers, and in the quantities demanded by BASF under any such agreement until the expiration of that agreement. All other terms and conditions of any such agreement must be reasonably related to market conditions for the formulation, filling, and packaging of seed treatments. Upon BASF's request, the United States, in its sole discretion, may approve one or more extensions of any such agreement for a total of up to an additional two (2) years. The United States, in its sole discretion, shall determine whether tolling pursuant to any such extension must be at variable cost.

(5)     *Clothianidin Active Ingredient Tolling Agreement:* At the option of BASF, on or before the Divestiture Closing Date, Bayer shall enter into one or more tolling agreements with BASF for the supply of the active ingredients used in the seed treatments divested as part of the Clothianidin Seed Treatment Business for an initial period of up to two (2) years. Bayer will toll these active ingredients for BASF at variable cost, in priority over other purchasers, and in the quantities demanded by BASF under any such agreement until the expiration of that agreement. All other terms and conditions of any such agreement must be reasonably related to market conditions for the tolling of active ingredients used in seed treatments. Upon BASF's request, the United States, in its sole discretion, may approve one or more extensions of any such agreement for a total of up to an additional four (4) years. The United States, in its sole discretion, shall determine whether tolling pursuant to any such extension must be at variable cost.

(6)     _Fluopyram Active Ingredient Tolling Agreement:_  At the option of BASF, on or before the Divestiture Closing Date, Bayer shall enter into a tolling agreement with BASF for the supply of the fluopyram active ingredient for an initial period of up to two (2) years. Bayer will toll this active ingredient for BASF at variable cost, in priority over other purchasers, and in the quantities demanded by BASF under any such agreement until the expiration of that agreement.  All other terms and conditions of any such agreement must be reasonably related to market conditions for the tolling of active ingredients used in seed treatments.  Upon BASF's request, the United States, in its sole discretion, may approve one or more extensions of any such agreement for a total of up to an additional four (4) years.  The United States, in its sole discretion, shall determine whether tolling pursuant to any such extension must be at variable cost.

(7)     _Reverse-Tolling Agreement for Bayer Products:_  At the option of Bayer, on or before the Divestiture Closing Date, BASF shall enter into a reverse-tolling agreement with Bayer for the formulation, filling, and packaging of the Bayer products manufactured at the Regina, Canada formulation facility that is part of the Glufosinate Ammonium Divestiture Assets for an initial period of up to two (2) years.  All terms and conditions of any such agreement must be reasonably related to market conditions for the formulation, filling, and packaging of these crop protection products.  Upon Bayer's request, the United States, in its sole discretion, may approve one or more extensions of such agreement for a total of up to an additional six (6) months.

(8)     _Other Supply and Tolling Agreements:_  At the option of BASF, on or before the Divestiture Closing Date, Bayer and BASF shall enter into any other supply, reverse-

25

supply, tolling, or reverse-tolling agreements reasonably necessary to allow BASF to operate any Divestiture Assets or to facilitate the transfer of Bayer facilities to BASF.

(9)     The terms and conditions of all agreements reached between Bayer and BASF under Paragraph IV(G) must be acceptable to the United States, in its sole discretion.  Any amendment or modification of such agreements may be entered into only with the approval of the United States, in its sole discretion.  Bayer shall perform all duties and provide all services required of Bayer under the agreements reached between Bayer and BASF under Paragraph IV(G).

(10)    BASF will use best efforts to develop or procure alternative sources of supply by the end of the initial periods identified in Paragraph IV(G) for supply and tolling agreements and will continue to use best efforts during any extension period.

(11)    Bayer will use best efforts to develop or procure alternative sources of supply by the end of the initial periods identified in Paragraph IV(G) for reverse-supply and reverse-tolling agreements and will continue to use best efforts during any extension period.

H.    **Transition Services**

(1)     _Transition Services Agreements for Information Technology Support:_  At the option of BASF, on or before the Divestiture Closing Date, Bayer shall enter into one or more transition services agreements to provide information technology services and support for the Divestiture Assets for an initial period of up to one (1) year.  Bayer will provide the transition services under any such agreement at no cost to BASF until the expiration of the agreement.  All other terms and conditions of any such agreement must be reasonably related to market conditions for the provision of the relevant services.  Upon BASF's request, the United States, in its sole discretion, may approve one or more extensions of this agreement for a total of up to an additional one (1) year.

(2) _Bayer Warranty of Transition Services Provided by Tata Consultancy_
_Services:_  Bayer has contracted with a third-party vendor, Tata Consultancy Services, to create

interim, stand-alone information and business support systems for some components of the

Divestiture Assets.  Bayer shall warrant to BASF that the systems developed by Tata

Consultancy Services will be operational on the Divestiture Closing Date and support operations

of the relevant components of the Divestiture Assets in a manner that is substantially consistent

with prior operations of these businesses.  Except for _de minimis_ deficiencies, Bayer shall use

best efforts to take all necessary actions to correct expeditiously any deficiencies inconsistent

with this warranty and shall be solely responsible for all costs incurred in resolving the

deficiencies, including by paying Tata Consultancy Services's fees.

(3) _Distribution Agreements for Glufosinate Ammonium and Divested Seed_
_Treatment Products:_  At the option of BASF, on or before the Divestiture Closing Date, Bayer

shall enter into one or more agreements to distribute on BASF's behalf products containing

glufosinate ammonium, clothianidin, _Bacillus firmus_ strain 1-1582, or fluopyram outside the

United States.  BASF shall terminate any such agreement within one (1) year.  Upon BASF's

request, the United States, in its sole discretion, may approve one or more extensions of the

period for BASF to terminate any such agreement for a total of up to an additional one (1) year.

(4) _Other Transition Services Agreements:_  At the option of BASF, on or

before the Divestiture Closing Date, Bayer shall enter into other transition services or reverse

transition services agreements to provide any other transition services reasonably necessary to

allow BASF to operate any Divestiture Assets or to facilitate the transfer of Bayer facilities to

BASF.  Unless specifically excepted elsewhere in this Final Judgment, Bayer will provide

transition services under any such agreement for an initial period of up to two (2) years and on

price terms no worse than at variable cost until the expiration of the agreement. All other terms

and conditions of any such agreement must be reasonably related to market conditions for the

provision of the relevant services. Upon BASF's request, the United States, in its sole discretion,

may approve one or more extensions of any such agreement for a total of up to an additional one

(1) year.

       (5)     The terms and conditions of all agreements reached between Bayer and

BASF under Paragraph IV(H) must be acceptable to the United States, in its sole discretion. Any

amendments or modifications of the agreements may be entered into only with the approval of

the United States, in its sole discretion. Bayer shall perform all duties and provide all services

required of Bayer under the agreements reached between Bayer and BASF under Paragraph

IV(H).

       (6)     BASF will use best efforts to develop alternative solutions by the end of

the initial periods identified in Paragraph IV(H) for transition services agreements and will

continue to use best efforts during any extension period.

       (7)     Bayer will use best efforts to develop alternative solutions by the end of

the initial periods identified in Paragraph IV(H) for reverse-transition services agreements and

will continue to use best efforts during any extension period.

      I.     **Clothianidin Licenses Back:** At the option of Bayer, BASF shall enter into an

agreement to provide Bayer the following licenses:

       (1)     a worldwide, exclusive, royalty-free, paid-up license to the rights

transferred to BASF in Paragraph II(X)(3) for (a) all non-seed treatment uses of clothianidin,

(b) all uses of active ingredients other than clothianidin, *Bacillus firmus* strain I-1582, or *Bacillus*

*thuringiensis* strain EX 297512, and (c) combinations of active ingredients that do not include

clothianidin, *Bacillus firmus* strain I-1582, or *Bacillus thuringiensis* strain EX 297512; and

      (2)    a worldwide, non-exclusive, royalty-free, paid-up license to the rights

transferred to BASF in Paragraphs II(X)(3) and II(X)(4) for the use of clothianidin in any Bayer

seed treatment mixture product for canola/oilseed rape, potatoes, sugarbeets, cereals, and

vegetables that has been commercialized by Bayer as of the date of the filing of the Complaint in

this matter (except Poncho/VOTiVO, Poncho Plus, and Poncho Super).

      J.    **Digital Agriculture License Back:**  At the option of Bayer, BASF shall enter

into an agreement to provide Bayer a non-exclusive, royalty-free, paid-up license to the Digital

Agriculture Divestiture Assets for the limited purpose of allowing Bayer to sell outside North

America the following digital agriculture products:  Expert.com web application; Weedscout

mobile application; Xarvio FieldManager web application; Xarvio FieldManager mobile

application; and Xarvio Scouting mobile application.  This license shall not give Bayer (1) any

rights to any improvements made by BASF to the Digital Agriculture Divestiture Assets or

(2) any rights to use any trademarks or brand names divested as part of the Digital Agriculture

Divestiture Assets, including, but not limited to, Expert.com, Weedscout, or Xarvio.

      K.    **Third-Party Agreements:**  At BASF's option, on or before the Divestiture

Closing Date, Bayer shall assign or otherwise transfer to BASF all transferable or assignable

agreements, or any assignable portions thereof, related to the Divestiture Assets, including, but

not limited to, all customer contracts, licenses, and collaborations.  Bayer shall use best efforts to

expeditiously obtain from any third parties any consent necessary to transfer or assign to BASF

all agreements related to the Divestiture Assets.  To the extent consent cannot be obtained and

the agreement is not otherwise assignable, in addition to the existing mitigation rules agreed

upon between Bayer and BASF, Bayer shall use best efforts to obtain for BASF, as expeditiously as possible, the full benefit of any such agreement as it relates to the Divestiture Businesses by assisting BASF to secure a new agreement and by taking any other steps necessary to ensure that BASF obtains the full benefit of the agreement as it relates to the Divestiture Businesses. Bayer will not assert, directly or indirectly, any legal claim that would interfere with BASF's ability to obtain the full benefit from any transferred third-party agreement to the same extent enjoyed by Bayer prior to the transfer.

L.   **Licenses, Registrations, and Permits**

(1)   Where necessary, BASF will apply for licenses, registrations, and permits that support the Divestiture Businesses to replace those held by Bayer as expeditiously as possible and, in any event, no later than six (6) months from the Divestiture Closing Date. The United States, in its sole discretion, may approve one or more extensions of this period, for a total of up to an additional six (6) months, for BASF to satisfy this requirement. BASF will make best efforts to obtain such licenses, registrations, and permits as expeditiously as possible.

(2)   Bayer will make best efforts to assist BASF with acquiring new licenses, registrations, and permits to support the Divestiture Businesses and, until BASF has the necessary licenses, registrations, and permits, Bayer will provide BASF with the benefit of Bayer's licenses, registrations, and permits in BASF's operation of the Divestiture Assets.

(3)   Bayer will globally maintain all product registrations for isoxaflutole, fluopyram, and any other retained product registrations related to the Divestiture Businesses, and Bayer will make best efforts to obtain regulatory approvals for isoxaflutole formulations used on isoxaflutole-tolerant cotton and soybeans.

M.      **Modification of Monsanto-BASF Yield and Stress Collaboration:** The Yield and Stress Collaboration will be modified consistent with the following: (1) Defendants shall not contribute any more genes to the Yield and Stress Collaboration; (2) the Yield and Stress Collaboration will continue as before with respect to genes or events in the three active research and development projects, except that BASF will receive a license with stacking rights to use in its own seeds any Yield and Stress Collaboration trait commercialized by Monsanto, on terms acceptable to the United States, in its sole discretion; (3) both Bayer and BASF shall receive (a) copies of all other genes and related research records in the Yield and Stress Collaboration regardless of crop, and (b) non-exclusive research, development, breeding, and commercialization rights to these genes in any crop with no cost, revenue, or profit sharing; and (4) the terms related to DroughtGard shall be unchanged.

N.      **Monsanto Midwest Soybean Germplasm:** At the option of BASF, on or before the Divestiture Closing Date, Bayer and Monsanto shall enter into one or more agreements facilitating the transfer and licensing of the Midwest Soybean Germplasm Divestiture Assets. The terms and conditions of any such agreement reached between Bayer and Monsanto and BASF must be acceptable to the United States, in its sole discretion. Any amendment or modification of any such agreement may be entered into only with the approval of the United States, in its sole discretion. Bayer and Monsanto shall perform all duties and provide all services required of them under any such agreement reached between Bayer and BASF.

## V.      FINANCING

Neither Bayer nor Monsanto shall finance all or any part of any purchase made pursuant to Section IV of this Final Judgment.

## VI.   HOLD SEPARATE AND ASSET PRESERVATION

Until all the divestitures required by this Final Judgment have been fully accomplished, Defendants shall take all steps necessary to comply with the Stipulation and Order entered by this Court.  Defendants shall take no action that would jeopardize any divestiture ordered by this Court.

## VII.   AFFIDAVITS

A.    Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been accomplished under Section IV, Bayer and Monsanto shall deliver to the United States and the Monitoring Trustee an affidavit, signed by each of Bayer's and Monsanto's Chief Financial Officer and General Counsel, which shall describe the fact and manner of Bayer's and Monsanto's compliance with Section IV.  Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by Bayer and Monsanto, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.    Within twenty (20) calendar days of the filing of the Complaint in this matter, each of the Defendants shall deliver to the United States and the Monitoring Trustee an affidavit that describes in reasonable detail all actions it has taken and all steps it has implemented on an ongoing basis to comply with this Final Judgment and the Stipulation and Order.  Each of the Defendants shall deliver to the United States and the Monitoring Trustee an affidavit describing any changes to the efforts and actions outlined in its earlier affidavits filed pursuant to this Final Judgment within fifteen (15) calendar days after the change is implemented.

C.    In addition to providing affidavits to the United States and the Monitoring Trustee as required under Paragraph VII(A) and Paragraph VII(B), Defendants shall immediately notify

the United States and the Monitoring Trustee verbally and in writing of any potential problems or delays in meeting any of the obligations set forth in this Final Judgment and the Stipulation and Order.

D.      Bayer and Monsanto shall keep all records of all efforts made to preserve and divest each of the Divestiture Assets until one year after such divestitures have been completed. BASF shall keep all records of all efforts made to acquire each of the Divestiture Assets until one year after such divestitures have been completed.

## VIII.   APPOINTMENT OF MONITORING TRUSTEE

A.      Upon filing of this Final Judgment, the United States may, in its sole discretion, appoint a Monitoring Trustee, subject to approval by this Court.

B.      The Monitoring Trustee shall have the power and authority to monitor Defendants' compliance with the terms of this Final Judgment and the Stipulation and Order entered by this Court, and shall have such other powers as this Court deems appropriate. The Monitoring Trustee shall investigate and report on Defendants' compliance with their respective obligations under, and efforts to effectuate the purposes of, this Final Judgment and the Stipulation and Order, including, but not limited to, reviewing (1) the implementation and execution of the compliance plan required by Section IX, and (2) any claimed breach by Bayer of any agreement entered into pursuant to Paragraph IV(G) or Paragraph IV(H). If the Monitoring Trustee determines that any violation of the Final Judgment or the Stipulation and Order or breach of any related agreement has occurred, the Monitoring Trustee shall recommend an appropriate remedy to the United States, which, in its sole discretion, can accept, modify, or reject a recommendation to pursue a remedy.

C.      Subject to Paragraph VIII(E), the Monitoring Trustee may hire at Bayer's cost and expense any consultants, accountants, attorneys, or other agents reasonably necessary in the

Monitoring Trustee's judgment and who shall be solely accountable to the Monitoring Trustee. Any such consultants, accountants, attorneys, or other agents shall serve on such terms and conditions as the United States approves, in its sole discretion, including confidentiality requirements and conflict of interest certifications.

        D.      Defendants shall not object to actions taken by the Monitoring Trustee in fulfillment of the Monitoring Trustee's responsibilities under any order of this Court on any ground other than the Monitoring Trustee's malfeasance. Any such objections by Defendants must be conveyed in writing to the United States and the Monitoring Trustee within ten (10) calendar days after the action taken by the Monitoring Trustee giving rise to the Defendants' objection.

        E.      The Monitoring Trustee shall serve at Bayer's cost and expense pursuant to a written agreement with Bayer and on such terms and conditions as the United States approves, in its sole discretion, including confidentiality requirements and conflict of interest certifications. The compensation of the Monitoring Trustee and any consultants, accountants, attorneys, and other agents retained by the Monitoring Trustee shall be on reasonable and customary terms commensurate with the individuals' experience and responsibilities. If the Monitoring Trustee and Bayer are unable to reach agreement on the Monitoring Trustee's or any agents' or consultants' compensation or other terms and conditions of engagement within fourteen (14) calendar days of appointment of the Monitoring Trustee, the United States may, in its sole discretion, take appropriate action, including making a recommendation to this Court. The Monitoring Trustee shall, within three (3) business days of hiring any consultants, accountants, attorneys, or other agents, provide written notice of such hiring and the rate of compensation to Bayer and the United States.

F.      The Monitoring Trustee shall have no responsibility or obligation for the operation of Defendants' businesses.

G.      Defendants shall use their best efforts to assist the Monitoring Trustee in monitoring Defendants' compliance with their individual obligations under this Final Judgment and the Stipulation and Order.  The Monitoring Trustee and any consultants, accountants, attorneys, and other agents retained by the Monitoring Trustee shall have full and complete access to the personnel, books, records, and facilities related to compliance with this Final Judgment and the Stipulation and Order, subject to reasonable protection for trade secret or other confidential research, development, or commercial information or any applicable privileges. Defendants shall take no action to interfere with or to impede the Monitoring Trustee's accomplishment of its responsibilities.

H.      After its appointment, the Monitoring Trustee shall file reports monthly until all the Divestiture Assets have been divested and thereafter as frequently as the United States determines, in its sole discretion, setting forth Defendants' compliance with their obligations under this Final Judgment and under the Stipulation and Order.  The Monitoring Trustee shall file such reports with the United States and, as appropriate, this Court.  To the extent that any such report contains information that the Monitoring Trustee deems confidential, that report shall not be filed in the public docket of this Court.

I.      The Monitoring Trustee shall audit Defendants' compliance with Section IX every six (6) months.  Defendants will provide full access to any documents and make employees available for interviews requested by the Monitoring Trustee pursuant to performing the semi-annual audit.  The Monitoring Trustee shall file a report of the audit with the United States and, as appropriate, this Court.  To the extent that any such report contains information

that the Monitoring Trustee deems confidential, that report shall not be filed in the public docket of this Court.

J.      The Monitoring Trustee shall serve until the sale of the Divestiture Assets is finalized pursuant to Section IV and the expiration of any agreement entered into pursuant to Paragraph IV(G) or Paragraph IV(H) or other agreements between Bayer and BASF that may affect the accomplishment of the purposes of this Final Judgment, unless the United States, in its sole discretion, terminates earlier or extends this period.

K.      If the United States determines that the Monitoring Trustee has ceased to act or failed to act diligently or in a reasonably cost-effective manner, it may recommend this Court appoint a substitute Monitoring Trustee.

## IX.   FIREWALL

A.      During the term of any agreement entered into pursuant to Paragraph IV(G) or Paragraph IV(H), Bayer and BASF shall implement and maintain reasonable procedures to prevent Shared Confidential Information from being disclosed by or through implementation and execution of these agreements to components or individuals within the respective companies involved in the marketing, distribution, or sale of competing products.

B.      Bayer and BASF each shall, within twenty (20) business days of the entry of the Stipulation and Order, submit to the United States and the Monitoring Trustee a document setting forth in detail the procedures implemented to effect compliance with Section IX. Upon receipt of the document, the United States shall notify Bayer and BASF within twenty (20) business days whether, in its sole discretion, it approves of or rejects each party's compliance plan. In the event that Bayer's or BASF's compliance plan is rejected, the United States shall provide Bayer or BASF, as applicable, the reasons for the rejection. Bayer or BASF, as applicable, shall be given the opportunity to submit, within ten (10) business days of receiving a

notice of rejection, a revised compliance plan.  If Bayer or BASF cannot agree with the United

States on a compliance plan, the United States shall have the right to request that this Court rule

on whether Bayer's and BASF's proposed compliance plan fulfills the requirements of

Section IX.

      C.     Bayer and BASF shall:

          (1)     furnish a copy of this Final Judgment and related Competitive Impact

Statement within sixty (60) calendar days of entry of the Final Judgment to (a) each officer,

director, and any other employee that will receive Shared Confidential Information; and (b) each

officer, director, and any other employee that is involved in (i) any contacts with the other

companies that are parties to any agreement entered into pursuant to Paragraph IV(G) or

Paragraph IV(H), or (ii) making decisions under any agreement entered into pursuant to

Paragraph IV(G) or Paragraph IV(H);

          (2)     furnish a copy of this Final Judgment and related Competitive Impact

Statement to any successor to a person designated in Paragraph IX(C)(1) upon assuming that

position;

          (3)     annually brief each person designated in Paragraph IX(C)(1) and

Paragraph IX(C)(2) on the meaning and requirements of this Final Judgment and the antitrust

laws; and

          (4)     obtain from each person designated in Paragraph IX(C)(1) and

Paragraph IX(C)(2), within thirty (30) calendar days of that person's receipt of the Final

Judgment, a certification that he or she (a) has read and, to the best of his or her ability,

understands and agrees to abide by the terms of this Final Judgment; (b) is not aware of any

violation of the Final Judgment that has not been reported to the company; and (c) understands

that any person's failure to comply with this Final Judgment may result in an enforcement action

for civil or criminal contempt of court against each Defendant or any person who violates this

Final Judgment.

## X.   COMPLIANCE INSPECTION

A.     For the purposes of determining or securing compliance with this Final Judgment,

or of any related orders such as any Stipulation and Order, or of determining whether the Final

Judgment should be modified or vacated, and subject to any legally recognized privilege, from

time to time authorized representatives of the United States Department of Justice, including

consultants and other persons retained by the United States, shall, upon written request of an

authorized representative of the Assistant Attorney General in charge of the Antitrust Division,

and on reasonable notice to Defendants, be permitted:

> (1)     access during Defendants' office hours to inspect and copy, or at the
> option of the United States, to require Defendants to provide hard copy or
> electronic copies of, all books, ledgers, accounts, records, data, and
> documents in the possession, custody, or control of Defendants, related to
> any matters contained in this Final Judgment; and

> (2)     to interview, either informally or on the record, Defendants' officers,
> employees, or agents, who may have their individual counsel present,
> regarding such matters.  The interviews shall be subject to the reasonable
> convenience of the interviewee and without restraint or interference by
> Defendants.

B.     Upon the written request of an authorized representative of the Assistant Attorney

General in charge of the Antitrust Division, Defendants shall submit written reports or responses

to written interrogatories, under oath if requested, related to any of the matters contained in this

Final Judgment as may be requested.

C.     No information or documents obtained by the means provided in Section X shall

be divulged by the United States to any person other than an authorized representative of the

executive branch of the United States, except in the course of legal proceedings to which the

United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

   D.  If at the time information or documents are furnished by Defendants to the United States, Defendants shall represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(l)(G) of the Federal Rules of Civil Procedure and mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(l)(G) of the Federal Rules of Civil Procedure," then the United States shall give Defendants ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

### XI.  NO REACQUISITION OR RECOMBINATION OF DIVESTITURE ASSETS

   Bayer may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.  Except for an acquisition pursuant to Paragraph IV(F)(2), BASF may not acquire from Bayer during the term of this Final Judgment any assets or businesses that compete with the Divestiture Assets.  In addition, Bayer and BASF shall not, without the prior written consent of the United States, enter into any new Collaboration involving any of the Divestiture Assets or expand the scope of any existing Collaboration involving any of the Divestiture Assets during the term of this Final Judgment.  The United States will notify Bayer and BASF of its decision within sixty (60) calendar days of receiving written notification from Bayer and BASF of the proposed new or expanded Collaboration.  The decision whether or not to consent to a Collaboration shall be within the sole discretion of the United States.

### XII.  NOTIFICATION OF FUTURE TRANSACTIONS

   A.  For transactions that are not subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), Bayer and Monsanto shall not, without providing advanced

notification to the United States, directly or indirectly acquire a financial interest, including

through securities, loan, equity, or management interest, in any company that researches,

develops, manufactures, or sells digital agriculture products or soybean, cotton, canola, or corn

seeds or traits.  In addition, Bayer and Monsanto shall not acquire any digital agriculture assets,

any trait assets, or all or substantially all of the germplasm assets from any such company

without providing advanced notification to the United States.

      B.     Such notification shall be provided to the United States in the same format as, and

per the instructions relating to, the Notification and Report Form set forth in the Appendix to

Part 803 of Title 16 of the Code of Federal Regulations as amended, except that the information

requested in Items 5 through 8 of the instructions must be provided only about digital agriculture

products or soybean, cotton, canola, or corn seeds or traits.  Notification shall be provided at

least thirty (30) calendar days prior to acquiring any such interest, and shall include, beyond

what may be required by the applicable instructions, the names of the principal representatives of

the parties to the agreement who negotiated the agreement, and any management or strategic

plans discussing the proposed transaction.  If within thirty (30) calendar days after notification,

the United States makes a written request for additional information, Bayer and Monsanto shall

not consummate the proposed transaction or agreement until thirty (30) calendar days after

submitting and certifying, in the manner described in Part 803 of Title 16 of the Code of Federal

Regulations as amended, the truth, correctness, and completeness of all such additional

information.  Early termination of the waiting periods in this paragraph may be requested and,

where appropriate, granted in the same manner as is applicable under the requirements and

provisions of the HSR Act and rules promulgated thereunder.  Section XII shall be broadly

construed and any ambiguity or uncertainty regarding the filing of notice under Section XII shall be resolved in favor of filing notice.

## XIII.   RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIV.   ENFORCEMENT OF FINAL JUDGMENT

A.      The United States retains and reserves all rights to enforce the provisions of this Final Judgment, including its right to seek an order of contempt from this Court.  Defendants agree that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of this Final Judgment, the United States may establish a violation of this Final Judgment and the appropriateness of any remedy therefor by a preponderance of the evidence, and they waive any argument that a different standard of proof should apply.

B.      The Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore all competition harmed by the challenged conduct. Defendants agree that they may be held in contempt of, and that the Court may enforce, any provision of this Final Judgment that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face.  In any such interpretation, the terms of the Final Judgment should not be construed against either party as the drafter.

C.      In any enforcement proceeding in which the Court finds that the Defendants have violated this Final Judgment, the United States may apply to the Court for a one-time extension

of this Final Judgment, together with such other relief as may be appropriate.  In connection with

any successful effort by the United States to enforce this Final Judgment against a Defendant,

whether litigated or resolved prior to litigation, that Defendant agrees to reimburse the United

States for any attorneys' fees, experts' fees, and costs incurred in connection with that

enforcement effort, including the investigation of the potential violation.

## XV.   EXPIRATION OF FINAL JUDGMENT

Unless this Court grants an extension, this Final Judgment shall expire ten (10) years

from the date of its entry, except that after six (6) years from the date of its entry, this Final

Judgment may be terminated upon notice by the United States to the Court and Defendants that

the divestitures have been completed and that the continuation of the Final Judgment no longer is

necessary or in the public interest.

## XVI.   PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest.  The parties have complied with the

requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making

copies available to the public of this Final Judgment, the Competitive Impact Statement, and any

comments thereon and the United States' responses to comments.  Based upon the record before

this Court, which includes the Competitive Impact Statement and any comments and responses

to comments filed with this Court, entry of this Final Judgment is in the public interest.

Date:  **2/8/19**

[Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. § 16]

_____

United States District Judge

J. Boasberg

### Appendix A

1.      Bayer will retain thirty (30) office facilities largely dedicated to non-divested Bayer businesses in Argentina (Buenos Aires and Chacabuco), Brazil (Paulinia), Canada (Calgary, Ottawa, Rosthern, Saskatoon, and Winnipeg), Czech Republic (Prague), France (two sites in Lyon), Germany (Langenfeld and Monheim), Great Britain (Cambridge), Greece (Athens and Thessaloniki), Hungary (Budapest), Latvia (Riga), Poland (Warsaw), Romania (Bucharest), Russia (Moscow), Turkey (Adana, Gebze, Istanbul, Izmir, and Sanliurfa), Ukraine (Kiev), and the United States (Champaign, Clayton, and Inaha).

2.      Bayer will retain one seed cleaning and bagging facility that is part of Bayer Crop Science headquarters in Monheim, Germany (known as "EOPC").

3.      Bayer will retain fourteen (14) formulation and filling sites largely dedicated to non-divested Bayer products in Argentina (Zarate), Australia (Kwinana and Pinkenba), Brazil (Belford Roxo), China (Hangzhou), Colombia (Barranquilla), Germany (Frankfurt), Guatemala (Amatitlán), Japan (Hofu), Korea (Daejeon), South Africa (Nigel), Spain (Quart de Poblet), Thailand (Bangpoo), and the United States (Kansas City).

4.      Bayer will retain thirty-four (34) general office facilities largely dedicated to non-divested businesses in Algeria (Algiers), Argentina (Munro), Australia (Pinkenba), Belgium (Diegem), Canada (Guelph), Chile (Santiago de Chile), Colombia (Bogotá), Costa Rica (San José), Denmark (Copenhagen), Egypt (Cairo), Germany (Monheim), Great Britain (Saffron Walden), Guatemala (Mixco), Hungary (Budapest), Iran (Tehran), Japan (Fukuoka), Kazakhstan (Astana), Kenya (Nairobi), Morocco (Casablanca and El Jadida), Panama (David), Peru (Ica and Lima), Poland (Warsaw), Portugal (Carnaxide), Romania (Bucharest), Russia (Krasnodar), Singapore (Singapore), South Korea (Anseong-si), Spain (Paterna), Ukraine (Kiev), the United States (two sites in West Sacramento), and Vietnam (Hanoi).

## Appendix B:  Monsanto Population Numbers

| | | | | | |
|---|---|---|---|---|---|
| (1) | JVK13764 | (53) | JVK13570 | (105) | JVK13641 |
| (2) | JVK13662 | (54) | JVK13571 | (106) | JVK13583 |
| (3) | JVK13647 | (55) | JVK13572 | (107) | JVK13584 |
| (4) | JVK13604 | (56) | JVK13573 | (108) | JVK13585 |
| (5) | JVK13363 | (57) | JVK13446 | (109) | JVK13586 |
| (6) | JVK13294 | (58) | JVK13449 | (110) | JVK13587 |
| (7) | JVK13624 | (59) | JVK13153 | (111) | JVK13588 |
| (8) | JVK13564 | (60) | JVK13157 | (112) | JVK13590 |
| (9) | JVK13301 | (61) | JVK13176 | (113) | JVK13612 |
| (10) | JVK13302 | (62) | JVK13197 | (114) | JVK13615 |
| (11) | JVK13304 | (63) | JVK13209 | (115) | JVK13617 |
| (12) | JVK13303 | (64) | JVK13253 | (116) | JVK13618 |
| (13) | JVK13305 | (65) | JVK13272 | (117) | JVK13619 |
| (14) | JVK13306 | (66) | JVK13273 | (118) | JVK13692 |
| (15) | JVK13307 | (67) | JVK13274 | (119) | JVK13699 |
| (16) | JVK13279 | (68) | JVK13275 | (120) | JVK13207 |
| (17) | JVK13281 | (69) | JVK13276 | (121) | JVK13230 |
| (18) | JVK13282 | (70) | JVK13388 | (122) | JVK13259 |
| (19) | JVK13283 | (71) | JVK13389 | (123) | JVK13574 |
| (20) | JVK13278 | (72) | JVK13390 | (124) | JVK13576 |
| (21) | JVK13280 | (73) | JVK13391 | (125) | JVK13577 |
| (22) | JVK13284 | (74) | JVK13394 | (126) | JVK13578 |
| (23) | JVK13592 | (75) | JVK13387 | (127) | JVK13579 |
| (24) | JVK13593 | (76) | JVK13392 | (128) | JVK13582 |
| (25) | JVK13596 | (77) | JVK13393 | (129) | JVK13434 |
| (26) | JVK13591 | (78) | JVK13231 | (130) | JVK13428 |
| (27) | JVK13594 | (79) | JVK13669 | (131) | JVK13429 |
| (28) | JVK13595 | (80) | JVK13670 | (132) | JVK13430 |
| (29) | JVK13598 | (81) | JVK13675 | (133) | JVK13431 |
| (30) | JVK13205 | (82) | JVK13252 | (134) | JVK13432 |
| (31) | JVK13224 | (83) | JVK13673 | (135) | JVK13433 |
| (32) | JVK13450 | (84) | JVK13396 | (136) | JVK13435 |
| (33) | JVK13455 | (85) | JVK13397 | (137) | JVK13204 |
| (34) | JVK13457 | (86) | JVK13400 | (138) | JVK13216 |
| (35) | JVK13458 | (87) | JVK13395 | (139) | JVK13370 |
| (36) | JVK13251 | (88) | JVK13398 | (140) | JVK13371 |
| (37) | JVK13451 | (89) | JVK13401 | (141) | JVK13372 |
| (38) | JVK13452 | (90) | JVK13402 | (142) | JVK13373 |
| (39) | JVK13453 | (91) | JVK13379 | (143) | JVK13375 |
| (40) | JVK13456 | (92) | JVK13380 | (144) | JVK13376 |
| (41) | JVK13761 | (93) | JVK13382 | (145) | JVK13377 |
| (42) | JVK13762 | (94) | JVK13383 | (146) | JVK13378 |
| (43) | JVK13763 | (95) | JVK13384 | (147) | JVK13374 |
| (44) | JVK13755 | (96) | JVK13386 | (148) | JVK13504 |
| (45) | JVK13756 | (97) | JVK13385 | (149) | JVK13505 |
| (46) | JVK13757 | (98) | JVK13723 | (150) | JVK13506 |
| (47) | JVK13758 | (99) | JVK13721 | (151) | JVK13507 |
| (48) | JVK13732 | (100) | JVK13634 | (152) | JVK13508 |
| (49) | JVK13733 | (101) | JVK13635 | (153) | JVK13509 |
| (50) | JVK13734 | (102) | JVK13638 | (154) | JVK13510 |
| (51) | JVK13735 | (103) | JVK13639 | (155) | JVK13503 |
| (52) | JVK13569 | (104) | JVK13640 | (156) | JVK13702 |

| | | | | | |
|---|---|---|---|---|---|
| (157) | JVK13703 | (213) | JVK13150 | (269) | JVK13416 |
| (158) | JVK13700 | (214) | JVK13649 | (270) | JVK13417 |
| (159) | JVK13701 | (215) | JVK13650 | (271) | JVK13420 |
| (160) | JVK13707 | (216) | JVK13652 | (272) | JVK13421 |
| (161) | JVK13258 | (217) | JVK13653 | (273) | JVK13418 |
| (162) | JVK13459 | (218) | JVK13654 | (274) | JVK13419 |
| (163) | JVK13460 | (219) | JVK13655 | (275) | JVK13422 |
| (164) | JVK13461 | (220) | JVK13605 | (276) | JVK13423 |
| (165) | JVK13462 | (221) | JVK13606 | (277) | JVK13424 |
| (166) | JVK13463 | (222) | JVK13607 | (278) | JVK13425 |
| (167) | JVK13464 | (223) | JVK13608 | (279) | JVK13426 |
| (168) | JVK13465 | (224) | JVK13609 | (280) | JVK13427 |
| (169) | JVK13466 | (225) | JVK13610 | (281) | JVK13178 |
| (170) | JVK13257 | (226) | JVK13611 | (282) | JVK13182 |
| (171) | JVK13408 | (227) | JVK13551 | (283) | JVK13223 |
| (172) | JVK13410 | (228) | JVK13552 | (284) | JVK13361 |
| (173) | JVK13404 | (229) | JVK13554 | (285) | JVK13362 |
| (174) | JVK13405 | (230) | JVK13557 | (286) | JVK13367 |
| (175) | JVK13406 | (231) | JVK13553 | (287) | JVK13369 |
| (176) | JVK13407 | (232) | JVK13555 | (288) | JVK13364 |
| (177) | JVK13409 | (233) | JVK13556 | (289) | JVK13366 |
| (178) | JVK13353 | (234) | JVK13196 | (290) | JVK13323 |
| (179) | JVK13354 | (235) | JVK13542 | (291) | JVK13325 |
| (180) | JVK13355 | (236) | JVK13544 | (292) | JVK13327 |
| (181) | JVK13357 | (237) | JVK13547 | (293) | JVK13330 |
| (182) | JVK13356 | (238) | JVK13549 | (294) | JVK13326 |
| (183) | JVK13358 | (239) | JVK13550 | (295) | JVK13328 |
| (184) | JVK13359 | (240) | JVK13523 | (296) | JVK13256 |
| (185) | JVK13360 | (241) | JVK13524 | (297) | JVK13331 |
| (186) | JVK13710 | (242) | JVK13525 | (298) | JVK13332 |
| (187) | JVK13711 | (243) | JVK13526 | (299) | JVK13333 |
| (188) | JVK13715 | (244) | JVK13527 | (300) | JVK13335 |
| (189) | JVK13709 | (245) | JVK13528 | (301) | JVK13336 |
| (190) | JVK13713 | (246) | JVK13171 | (302) | JVK13334 |
| (191) | JVK13767 | (247) | JVK13180 | (303) | JVK13341 |
| (192) | JVK13768 | (248) | JVK13188 | (304) | JVK13342 |
| (193) | JVK13751 | (249) | JVK13211 | (305) | JVK13308 |
| (194) | JVK13753 | (250) | JVK13559 | (306) | JVK13309 |
| (195) | JVK13754 | (251) | JVK13560 | (307) | JVK13310 |
| (196) | JVK13725 | (252) | JVK13563 | (308) | JVK13311 |
| (197) | JVK13726 | (253) | JVK13529 | (309) | JVK13312 |
| (198) | JVK13730 | (254) | JVK13530 | (310) | JVK13158 |
| (199) | JVK13731 | (255) | JVK13531 | (311) | JVK13295 |
| (200) | JVK13683 | (256) | JVK13532 | (312) | JVK13297 |
| (201) | JVK13688 | (257) | JVK13499 | (313) | JVK13298 |
| (202) | JVK13684 | (258) | JVK13500 | (314) | JVK13227 |
| (203) | JVK13685 | (259) | JVK13501 | (315) | JVK13293 |
| (204) | JVK13687 | (260) | JVK13502 | (316) | JVK13296 |
| (205) | JVK13689 | (261) | JVK13471 | (317) | JVK13300 |
| (206) | JVK13690 | (262) | JVK13472 | (318) | JVK13313 |
| (207) | JVK13691 | (263) | JVK13473 | (319) | JVK13314 |
| (208) | JVK13661 | (264) | JVK13474 | (320) | JVK13315 |
| (209) | JVK13664 | (265) | JVK13476 | (321) | JVK13316 |
| (210) | JVK13667 | (266) | JVK13477 | (322) | JVK13155 |
| (211) | JVK13668 | (267) | JVK13475 | (323) | JVK13174 |
| (212) | JVK13663 | (268) | JVK13478 | (324) | JVK13185 |

| | | | | |
|---|---|---|---|---|
| (325) | JVK13199 | | (381) | JVK13493 |
| (326) | JVK13203 | | (382) | JVK13467 |
| (327) | JVK13225 | | (383) | JVK13469 |
| (328) | JVK13320 | | (384) | JVK13479 |
| (329) | JVK13321 | | (385) | JVK13480 |
| (330) | JVK13322 | | (386) | JVK13481 |
| (331) | JVK13264 | | (387) | JVK13482 |
| (332) | JVK13266 | | (388) | JVK13483 |
| (333) | JVK13270 | | (389) | JVK13484 |
| (334) | JVK13271 | | (390) | JVK13486 |
| (335) | JVK13285 | | (391) | JVK13487 |
| (336) | JVK13286 | | (392) | JVK13488 |
| (337) | JVK13290 | | (393) | JVK13411 |
| (338) | JVK13291 | | (394) | JVK13412 |
| (339) | JVK13288 | | (395) | JVK13413 |
| (340) | JVK13746 | | (396) | JVK13414 |
| (341) | JVK13747 | | (397) | JVK13415 |
| (342) | JVK13750 | | (398) | JVK13436 |
| (343) | JVK13743 | | (399) | JVK13437 |
| (344) | JVK13744 | | (400) | JVK13438 |
| (345) | JVK13645 | | (401) | JVK13440 |
| (346) | JVK13646 | | (402) | JVK13441 |
| (347) | JVK13682 | | (403) | JVK13442 |
| (348) | JVK13656 | | (404) | JVK13443 |
| (349) | JVK13625 | | (405) | JVK13445 |
| (350) | JVK13626 | | (406) | JVK13194 |
| (351) | JVK13621 | | (407) | JVK13254 |
| (352) | JVK13599 | | (408) | JVK13348 |
| (353) | JVK13600 | | (409) | JVK13540 |
| (354) | JVK13602 | | (410) | JVK13541 |
| (355) | JVK13603 | | (411) | JVK13629 |
| (356) | JVK13566 | | (412) | JVK13630 |
| (357) | JVK13567 | | (413) | JVK13632 |
| (358) | JVK13568 | | (414) | JVK13633 |
| (359) | JVK13533 | | (415) | JVK13344 |
| (360) | JVK13534 | | (416) | JVK13346 |
| (361) | JVK13535 | | (417) | JVK13347 |
| (362) | JVK13536 | | (418) | JVK13349 |
| (363) | JVK13537 | | (419) | JVK13352 |
| (364) | JVK13512 | | | |
| (365) | JVK13514 | | | |
| (366) | JVK13515 | | | |
| (367) | JVK13513 | | | |
| (368) | JVK13516 | | | |
| (369) | JVK13517 | | | |
| (370) | JVK13518 | | | |
| (371) | JVK13519 | | | |
| (372) | JVK13520 | | | |
| (373) | JVK13494 | | | |
| (374) | JVK13495 | | | |
| (375) | JVK13496 | | | |
| (376) | JVK13497 | | | |
| (377) | JVK13498 | | | |
| (378) | JVK13490 | | | |
| (379) | JVK13491 | | | |
| (380) | JVK13492 | | | |